# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

|  |  |  |
|---|---|---|
| **DALIA VALENCIA,** | ] |  |
| a/ka **DALIA VELASCO** | ] |  |
| **DALIA KRANTZ** | ] |  |
| **DALIA KRATZ VALENCIA** | ] | Case No. 3:15-CR-00228-DB |
| Petitioner, | ] |  |
|  | ] |  |
|  | ] |  |
| **Vs.** | ] |  |
|  | ] |  |
|  | ] |  |
| **UNITED STATES OF AMERICA,** | ] |  |
| Respondent, | ] |  |

## MOTION SEEKING MODIFICATION OF SENTENCE UNDER TITLE 18 U.S.C., SECTION 3582 AND APPARENT EXTRAORDINARY DANGEROUS NATURE OF THE COVID-19 OUTBREAK AMONG FEDERAL PRISON POPULATION.

Dalia Valencia, (hereinafter Ms. Valencia) hereby acting Pro se, seeking a modification of her current term of imprisonment. Ms. Valencia seeks that the Warden at FMC Carswell, be compelled to release her on home confinement under the CARES Act Confinement Provision. Alternatively, that her physical custody be transferred to her probation portion custody. As to reasons why this request should be GRANTED, Ms. Valencia relies upon the following in support of her request for relief:

1.  On about October 28, 2015, Dalia Valencia was charged in a Fourth
    Superseding Indictment in the above-styled number cause. Ms. Valencia later
    agreed to enter a plea of guilty. The Court recognized and accepted Ms.
    Valencia's plea agreement and called for a sentence of 180-months.
    Ms. Valencia has served a substantial portion of her sentence (5-years). Ms.
    Valencia is now serving her sentence at the Federal Medical Facility (Carswell)
    at J ST BLDG 3000, Fort Worth, TX. 76127.

    Ms. Valencia presents that she is in danger of exposure to the COVID-19 at
    Carswell Federal Medical Center where she is currently confined. The
    Bureau's coronavirus tracker shows at least two inmates have tested positive at
    the FMC Carswell. Ms. Valencia shares housing with 250 women in her
    housing unit. They sleep four to a cell and less than three feet apart. All
    inmates are expected to wear the same disposable mask every day. The
    phones are in pretty heavy use un-sanitized. Several women have been
    removed to an isolation wing because they are suspected of having COVID-
    19.

    While the Bureau of Prisons has instituted measures to prevent the spread of
    coronavirus inside the prisons, the conditions at FMC Carswell make the
    spread of infectious diseases all but inevitable.

2.  Ms. Valencia also presents that the omission of mitigating factors during her
    sentencing respecting her sexual assault by an El Paso County Jail guard
    during pretrial proceedings deprived her from obtaining a less harsh sentence.

3.  Ms. Valencia also presents that her rehabilitation and good behavior during
    her incarceration make her suitable candidate for an amended sentence in the
    form of transferring physical custody to special probation now under
    extraordinary circumstances.

Ms. Valencia does not dispute her guilt in this matter as she voluntarily entered her plea agreement and accepted full responsibility. Ms. Valencia however accepted her responsibility in pursuing a fair less harsh sentence. Ms. Valencia now suggests that, amending her sentence could effectively reduce the severity of her punishment by transferring the remaining of her 180-month of physical custodial portion to the probation custody term of the same. Ms. Valencia presents that reducing custody sentence and increasing special probation sentence is permissible, because transferring her sentence to probation is a single indivisible sentence and not separate. In fairness, such amendment can only be characterized as making Ms. Valencia's sentence less severe. Ms. Valencia is to remain under the custody and jurisdiction of the Attorney General through probation custody, also she will be subject to immediate incarceration if she violates any of the special terms.

The only change in the sentence that Ms. Valencia moves to amend, is that portion of corporal custody from physical incarceration, to special probation which will constitute indisputably to a less severe punishment.

## I.        PROCEDURAL HISTORY

On or about October 28, 2015, Dalia Valencia was charged in a Fourth Superseding Indictment in the above-styled numbered causes. Ms. Valencia later agreed to enter a plea of guilty in case number EP-15-CR-228, to one count of conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity. see attachment 1. Ms. Valencia further agreed to plead guilty to one count information charging Ms. Valencia with theft of public money. In exchange the government agreed to move for dismissal of the remaining counts of the Fourth

Superseding Indictment in cause number EP-15-CR-228. The government further agreed to move for dismissal of the First Superseding Indictment and the original indictment in EP-15-CR-1646 that had also been pending against Ms. Valencia.

In addition, Ms. Valencia was required to plead to a notice of special sentencing factors relevant to the Fourth Superseding Indictment. Specifically, Ms. Valencia agreed she conspired to possess a controlled substance, which involved 1,000 kilograms or more of marijuana with intent to distribute. In addition to that, the plea agreement between Ms. Valencia and the government contained an 11 (c) (1)(C) agreement recommending that Ms. Valencia not be sentenced to a term greater than 180 months (15 years). The government further agreed to move for dismissal of the indictment pending against Josefine Gurrola in EP-16-CR-342, and to make a recommendation of a binding recommendation as to Josefine Gurrola, that the sentence be time-served. Also, in exchange, the government agreed it would not prosecute Jesus Valencia, son of Ms. Valencia, for his actions involving the concealment of Monica Velasco on or about January 25th, 2016, through February 5th, 2016.

At sentencing---under RICO, Group One and Group Two, Ms. Valencia was found to be a 38, plus 2 for active participant and money laundering with 3 levels, which gave a total calculation of 43. From there, there was 2 points added for the multiple count adjustment and 3 taken away for acceptance of responsibility which made the total offense level 42 and required a sentence of 360 months to life imprisonment. However, the Court recognized, and accepted Ms. Valencia's plea agreement called for a sentence of not more than 180 months on the Rico charge.

## II.    JURISDICTION

**Section 3582 provides:**

(a) the court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation. In determining whether to make a recommendation concerning the type of prison facility appropriate for the defendant, the Court shall consider any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C., Section 994(a)(2).

(b) Notwithstanding, the fact that a sentence to imprisonment can subsequently be-

(1) modified pursuant to the provisions of subsection (c);

(2) corrected pursuant to the provisions of rule 35 of the Federal Rules of Criminal Procedure and Section 3742 or;

(3) appealed and modified, if outside the guideline range, pursuant to the provisions of section 3742;

a judgement of conviction that includes such a sentence constitutes a final judgement for all other purposes.

(c) The court may not modify a term of imprisonment once it has been imposed except that--

(1) in any case— (A) the court, upon motion of the Director of the Bureau of Prisons, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) after considering the factors set forth in section 3553(a) to the extent they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such reduction;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to the sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any person or the community, as provided under section 3142(g);

(B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure and;

(2) in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 994(o), upon motion of the defendant or Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such reduction is applicable with policy statements issued by the Sentencing Commission.

(d) The court, in imposing a sentence to a term of imprisonment upon a defendant

convicted of a felony set forth in chapter 95 (racketeering) or 96 (Racketeering Influenced Corrupt Organizations) of this Title or in the Comprehensive Drug Abuse Prevention and Control Act of 1970, or anytime thereafter upon motion by the Director of the Bureau of Prisons or a United States Attorney, may include part of the sentence an order requires that the defendant not associate or communicate with a specified person, other that his attorney, upon showing of probable cause to believe that association or communication with such person for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise

## III.    COVID – 19 EXPOSURE

Additionally, Ms. Valencia presents that she is exposed to imminent risk of contracting COVID-19 at her place of confinement due the outbreak among federal prison population, and where there has been announced that CARSWELL FEDERAL MEDICAL CENTER at least two cases have contracted COVID-19. At least one inmate has disease.

Federal Medical Facility Carswell is a prison with more than 1,600 woman who have special medical and mental health needs. There are 250 women in each housing unit.

Conditions at Carswell FMC is critical – four inmates sleep in dorm-style barracks and less than  three feet apart, share showers and communal bars of soap, limited toilet paper and limited hand soap – run afoul of the prisoners' Eighth Amendment protection from cruel and unusual punishment.

Attorney General William Barr issued a Memo to the Bureau of Prisons, directing the

BOP to expedite its use of home confinement, giving highest priority to medically vulnerable prisoners at hard-hit Oakdale, a low-security facility nearly 200 miles from New Orleans. The Federal Bureau of Prisons has 177,000 inmates under its care. In the past week, seven have died from COVID-19 and the BOP is reporting 91 inmates tested positive along with 50 staff members. It is believed that those numbers understate the real figures and that hundreds more inmates and staff are infected. **See. Att. Gen. Memo.**

New figures also showed more than 50 inmates have tested positive at FCC Butner, a federal prison complex in North Carolina, up from 11 reported inmate cases the day before.

Federal prisons in Connecticut and Ohio also have been stricken with outbreaks in recent weeks. As of Monday, 196 inmates and 63 staff members had tested positive for coronavirus at federal prisons across the U.S., according to data from the BOP.

**The Lompoc Federal Penitentiary has the highest number of cases among prisons nationwide with 67 inmates confirmed positive, according to data Tuesday from Santa Barbara County and the <u>Bureau of Prisons</u>.**

**The outbreak at the Lompoc prison was first announced by the county last week and includes 24 prison employees in addition to inmates, public health officials announced.**

The unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent. Although there is not yet a known outbreak among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop. *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), https://doi.org/10.1086/521910 (noting that in jails "[t]he

8

probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"); *see also* Claudia Lauer & Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus,* Associated Press (Mar. 7, 2020). The magnitude of this risk has grown exponentially since the announcement of the first federal prison case of COVID-19 in the United States.

Though the BOP has admirably put transmission mitigation measures in place, *see* Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan,* https://www.bop.gov/resources/news/20200313_covid-19.jsp, in the event of an outbreak at the CARSWELL FEDERAL MEDICAL CENTER (where Ms. Valencia is currently imprisoned), substantial medical and security challenges would almost certainly arise. A comprehensive view of the danger Ms. Valencia poses to the community requires considering all factors—including this one—on a case-by-case basis. *See, e.g., United States v. Raihan,* No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12-19 (E.D.N.Y. Mar. 12, 2020) (deciding to continue a criminal defendant on pretrial release rather than order him remanded to the Metropolitan Detention Center due, in part, to the Magistrate Judge's recognition of the fact that "[t]he more people we crowd into that facility, the more we're increasing the risk to the community").

Ms. Valencia's proposal is that her sentence be amended from 180-months corporal custodial of which she has served more than 5-years, to be placed on home confinement under the CARES Act, and/or probation custodial for the rest of her remaining sentence. Ms. Valencia suggests that, amending her sentence could effectively reduce the severity of her punishment by transferring the remaining of her

180-month of the custodial portion to the probation term of it. Ms. Valencia presents that reducing custody sentence and increasing special probation sentence is permissible, because a reduction in sentence to probation is a single indivisible sentence and not separate. See United States v. Thompson, 979 F.2d 743; 1992 U.S. App. LEXIS 29007 (9th Cir. 1992)( In Thompson, the court held that pursuant to Rule 35, the court could amend (5) five years of imprisonment and (5) years of special parole, to (2) two years imprisonment and (8) eight years special parole, this to mitigate the punishment, because the sentence was a single indivisible sentence and not separate).

Specifically, Ms. Valencia will not be exposed to COVID-19 and Ms. Valencia would remain under the jurisdiction of the Attorney general and probation for a period of whatever term of probation this court determines to be suitable, but the custodial portion of her sentence could be amended to "any term of probation" representing the 180-months physical custody.

   Ms. Valencia presents extraordinary and compelling reason for amending her sentence and for release on probation or home confinement, such release is consistent with the existing extraordinary circumstances. In so concluding, this Court is grievously aware of the current global health crisis caused by COVID-19. The President has declared a National Emergency due to the spread of the novel coronavirus and states and localities across the nation have implemented measures to stymie its rapid spread. And while the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection. See, e.g., Danielle Ivory, "We Are Not a Hospital": A Prison

10

*BracesfortheCoronavirus,* N.Y.Times(March17,2020),  https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html (citing densely populated living conditions, dearth of soap, hand sanitizer, and protective gear, and impossibility of maintaining safe distance between inmates because prisoners are at particular risk of infection). The virus's spread at the Cook County jail in Chicago provides an alarming example: in a single week, the county jail went from two diagnoses to 101 inmates and a dozen employees testing positive for the virus. *See* Timothy Williams et al., *As Coronavirus Spreads Behind Bars, Should Inmates Get Out?*, N.Y. Times (March 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html.

Indeed, news reports indicate that the virus has already begun infiltrating federal prisons; in one prison in Louisiana, an inmate died after testing positive for the virus and at least 30 other inmates and staff have tested positive. *See* Kimberly Kindy, *An Explosion of Coronavirus Cases Cripples a Federal Prison in Louisiana*, Wash. Post (March 29, 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html (hereinafter, *An Explosion of Coronavirus Cases*). To date, at least two inmate and one staff member have tested positive for the virus in FMC CARSWELL, where Ms. Valencia is housed. *See* COVID-19, Fed. Bureau of Prisons (March 29, 2020), https://www.bop.gov/coronavirus/.


Dalia Valencia is exposed to COVID-19 and has demonstrated extraordinary and compelling reason for release on home confinement under extraordinary circumstances. Mr. Valencia prays that this honorable court compel the warden at Carswell Federal Medical Center to release her under specific conditions.

11

## III   MITIGATING FACTORS NOT ACCOUNTED DURING SENTENCING

### The Eighth Amendment.

Up on Ms. Valencia's arrest on September of 2015,  Ms. Valencia endured extremely harsh punishment that was not exposed during her sentencing and that under the protective shadow of the Eighth Amendment could have changed the outcome of the proceedings and could have resulting in a lesser sentence up on review from this court.

Ms. Valencia urges that a 180-month sentence not only over represents the punishment applicable under the circumstances but is excessive. Ms. Valencia does not deserve such a harsh punishment considering that not only she was mentally tortured during pre-trial proceedings when maintained in solitary confinement for over Two (2)-years but she experienced treatment that is solely performed to those committing the worse crimes against the United States.

The level of punishment against Ms. Valencia, was caused accordingly, because of the concealment of her sister Ms. Monica Velasco, because she refused to assist the government in locating her. It was simply unreasonable to assume that under the circumstances of her incarceration and isolation she could provide the government any information in this respect. Ms. Valencia encountered with U.S. Marshals in multiple occasions, the subject matter of every encounter was officers wanting information about her sister. Then threats about bringing charges against her son Jesus Valencia and her mother Josefina Gurrola for their actions involving the concealment of Ms. Monica Velasco.

During the more than Two (2)-years in solitary confinement she was sexually molested and abused additionally, mentally tortured and abused.  Her isolation was

no way related to any disciplinary infraction or based on punitive justification; the existence of substantial evidence exhibits that on January of 2016, she was sexually abused by an El Paso County Jail guard who entered a restroom Ms. Valencia was using during her rec time; She was threatened by the guard and also from the same investigation team should she report said despicable action. Not only the existence of video footage exists and support this horrible incident, but the facts were immediately reported by other inmates.  The video of the incident confirmed fellow inmate's concerns, also Ms. Valencia admitted that she had been attacked when questioned, despite her desperate fear of the guard and investigation team and possible reprisals. **See. Affidavit of Dalia Valencia. <u>Attachment   A.</u>**

  Despite Ms. Valencia's outcry and prayers for mercy, her suffering was insufficient and simply ignored by the people in charge of rendering her the protection against arbitrariness. Here, the government without a doubt was more concerned about putting excessive pressure against Ms. Valencia so she assisted in the capturing of her sister, even if this meant violating all rights under the cornerstone protective shadows of the Eighth Amendment.

  Mental Health Progress Report was conducted on October 7, 2016, by Medical Staff at Otero County Prison Facility. As Subjective Data revealed that Ms. Valencia reported she was mentally unstable having nightmares consequence of her previous sexual assault, also she presented a level of worry about her sentencing coming up on December of 2016, she was feeling sad, confused, anxious. See. Medical Report. **Exhibit  B.**

  Although per policy, she was immediately moved to the Otero Private facility in New Mexico, where she was also placed in solitary confinement, regrettably, the Otero facility under higher command kept her isolated. Ms. Valencia was treated

worse than those committing the worse crimes in the United States. Despite the fact that Otero Private Facility is not set up with special housing for females, Ms. Valencia was kept in a medical unit isolated, with folder or paper over her door with the lights on twenty-four hours a day, restricted from all communication to the exterior or with other fellow inmates.

Substantial evidence reveals Ms. Valencia's out cry. The Clinical Department at the Otero County Prison Facility Records confirm that she was evaluated in multiple occasions, and that during every single encounter with medical staff at the Otero Clinical Department she mentioned that she was suffering collateral mental breakdown consequence from her previous sexual assault.

The Otero Clinical Department at no time issued or recommended any sort of mental treatment, therapy or psychological evaluation, the typical evaluation made to those victims of sexual assault.

Ms. Valencia's prolonged detention in solitary confinement caused her to become ill, mentally and physically. Medical records confirm that she presented discoloration of portions of her skin and body and face, as well as she presented difficulty breathing.

Accordingly, Ms. Valencia was originally placed in Solitary, or Special Housing because of concerns for potential witnesses in her brother's cases. Very contradicting was the fact that at that time there was no remaining trials in Ms. Valencia's case. Government's arbitraries where solely caused by her supposed refusal to reveal to the government information in locating her sister (Mr. Monica Velasco, a 43-year old former teacher wanted for money laundering and racketeering and drug conspiracy in Ms. Valencia's brother's case charges related to the Velasco family

crime group.).

## VI.    STATEMENT OF RELEVANT FACTS

At sentencing, Ms. Valencia accepted responsibility but stated that she was currently before the Court because of things her brothers Samuel and Emmanuel Velasco had done. Id. Ms. Valencia further agreed that "she would be willing to provide truthful information and cooperate with the government--although ultimately Ms. Valencia was not called upon to do so. Counsel, Clay Hernandez, although he noted objections to the Presentence Report during sentencing, did not however seek a two-point role-reduction as would apply to Ms. Valencia under U.S.S.G., Section's 5C1.2 and 3553(a).

In the present case, no later than the time of sentencing hearing, Ms. Valencia agreed to provide truthfully to the government all information and evidence she possessed concerning the offense and offenses that were part of the same course of conduct or of a common scheme or plan, and the fact that Ms. Valencia had no relevant or useful information shall not preclude a determination by the Court that she has complied with the requirements under 5C1.2(a). A defendant bears the burden of establishing the he/she is entitled to an adjustment and Ms. Valencia has herein done so.

### SUMMARY OF FACTS

Here, Dalia Valencia, who has been convicted of a crime for the first time in her life and has endured extraordinary suffering during her incarceration, seeks a downward departure under the safety-valve exception and Title 18 U.S.C., Section 3553 (a) based upon (1) a role-reduction, based upon her role in the

15

charged criminal conduct which was not of a violent nature; (2) her acceptance of responsibility; and (3) her agreement to provide co-operation through truthful information and assistance to the government.

Ms. Valencia principally aided her siblings and while guilty of love and misplaced loyalty maintains that she did not intend the ultimate results of these crimes be committed. Her remorse for the crimes committed and the circumstances surrounding her involvement in these crimes cries out to the Court in support of a downward departure and reduction of her offense level in this matter.

However, Ms. Valencia although represents a perfect candidate for Safety Valve reduction in her sentence, moves only for the permissible amendment of her physical custody to be placed on probation for the rest of her remaining sentence.  A permissible practice since this will not constitute a reduction od sentence, but an adjustment of sentence to a less harsh punishment.

## VI   ADDITIONAL FACTORS FOR AMENDING MS. VALENCIAS' SENTENCE THAT SHOULD BE CONSIDERED

**A).   CRIMINAL HISTORY:**  Ms. Valencia had a clean criminal record in the United States and in Mexico prior to her arrest and conviction.

**B).   COMMENTS FROM VICTIMS:**  Unknown / Non-Applicable

16

**C).   UNRESOLVED DETAINERS**:   None "unresolved detainers". Mr. Valencia prior to her incarceration in the present case exhibits an impeccable record, she is without the minimum infraction.

**D).   SUPERVISED RELEASE VIOLATIONS**:   None / Non-Applicable.

**E).   INSTITUTIONAL ADJUSTMENT**:   Ms. Valencia has maintained herself completely free of disciplinary reports during the over 5 years of her incarceration. In addition to clear conduct, she has an excellent prison work record; Presently works for the Recreation Department as a fitness instructor at the Carswell Federal Medical Center. Ms. Valencia has completed numerous programs and courses, and; she has a very favorable disposition with staff.  She is very respectful; do not cause trouble and follow regulations and orders with no quarrels;

**F).   DISCIPLINARY INFRACTIONS**:   None;

**G).   PERSONAL HISTORY DERIVED FROM PSI REPORT**:   Ms. Valencia is a U.S. Citizen and a first offender; She lived in the United States;  She paid taxes; She has no history of drug or alcohol abuse and a very long history of employment prior to her incarceration and during her incarceration;  No history of domestic violence or abuse; She was married with three children prior to her arrest; she provided financial support for her children prior to her incarceration, and; She has maintained excellent family ties throughout her many years of imprisonment.

**H). FAMILY TIES AND SUPPORT:**

Ms. Valencia is the mother of three children who are eager to support her up on release from incarceration.

1. **Jesus Valencia**: Born on August 28, 2001. Jesus Valencia is Ms. Valencia's oldest son and has maintained excellent relationship with his mother during

2. the 5-years of her incarceration. Jesus Valencia is an excellent student,

3. positive, of good character. Jesus Valencia at this particular time attends medical school, his goal is to make Ms. Valencia proud and make a difference in the United States. He expresses that he desires to become a brilliant doctor in this country.  Jesus Valencia is eager to extend moral and economic support to his mother up on her release.  See. **Letter From Jesus Valencia Attachment   C.**

4. **Valeria Valencia:** Born on October 31, 2001. Valeria Valencia has also maintained excellent relationship with her mother during her 5-years of incarceration. Valeria Valencia is also an excellent student, positive, of good character. Valeria Valencia is a High School student, with excellent grades, desires to pursue a career as an occupational therapist as she goes off to college. Her relationship with Ms. Valencia can only be described as the best. She misses her mother and is eager to incorporate her to her present life. **See. Letter From Valeria Valencia. Attachment   D.**

5. **Jeffrey Tyler: Born on December 30, 2011.** Jeffrey Tyler Krantz is the youngest of Ms. Valencia's children. Jeffrey has suffered the most based on his mother's absence. At his limited age has endured not having his mother present during the most critical stages of his life. Now in the custody of his father Mr. Jeffrey Scott Krantz. Jeffry misses his mother and has suffered the most being that there is no answer to the many questions asked by him during the past 5-years of Ms. Valencia's absence. His dream is to have his mother home as soon as possible. Little Jeffry is the best under the circumstances, excellent student achieved Honor Roll as a current 2nd grade student.

6. **Jeffrey Scott Krantz.:** Mr. Krantz was legally married to Dalia Valencia. Together procreated little Jeffrey Tyler Krantz who is now under his care. Mr. Krantz is currently a West Texas Radiologist, P.A. Mr. Krantz currently maintains steady employment. Mr. Krantz resides at 740 Draco PL, El Paso TX. 79907.  Mr. Krantz has maintained the best of communication and relationship with Ms. Valencia. Mr. Krantz offers that he is willing to provide

housing and sustain her economically upon Mr. Valencia's release. Mr. Krantz is of an impeccable moral character and is capable and willing to provide Mr. Valencia the essential needs upon her release from custody. See. **Letter From Jeffrey Scott Krantz. Attachment  E.**

**I). LENGTH OF SENTENCE AND AMOUNT OF TIME SERVED:**  Ms. Valencia received a 180-months sentence in 2015, under the De Facto laws no parole eligibility.  Because the law in effect in 2015 mandates no parole eligibility, Ms. Valencia is to remain in prison for 85% of the 180-months.

**J).   INMATES CURRENT AGE:**   48-years old (DOB: April 10,1972)

**K).   INMATE RELEASE PLANS:**  Dalia Valencia will live with husband Mr. Jeffrey Scott Krantz at 740 Draco Pl, El Paso Texas, 79907, on Mr. Krantz owned property. Mr. Krantz and children are eager to support her financially, provide housing and medical care.  At the age of 48, Dalia Valencia is capable of maintaining employment. Ms. Valencia is willing to assist her husband and children up on release.

Dalia Valencia is capable and desires to work upon her release and has been offered a position in Craze Culture, LLC. DBA owned by Mr. Charlie Navar in El Paso, TX. Ms. Valencia has been highly recommended and possess the ability and desire to maintain employment up on her release. **See. Letter From Charlie Navar. Attachment  F.**

Dalia Valencia will not pose an economic weight to the community, as she has been offered employment upon her release.

**L).   WHETHER RELEASE WOULD MINIMIZE THE SEVERITY OF THE OFFENSE:** Dalia Valencia has been in prison for 5-years on the instant offense; her prior record reflects absolutely clean prison record; Prior to this offense there is no

criminal record of any other arrests or convictions.

Ms. Valencia understands that releasing her from prison will not minimize the severity of the offense committed, however, Mr. Valencia underlines that she is minimal participant in this case, and that she aided her siblings Samuel and Emmanuel Gurrola while guilty of love and misplace of loyalty towards her family members. Ms. Valencia has served a substantial portion of her 180-month sentence and has paid to the community for her wrongful actions and bad decisions.

Ms. Valencia did not intend the ultimate results of these crimes be committed. Ms. Valencia has been in prison for more than sufficient time to satisfy the purpose of sentencing and punishment.

**M).    FACTORS REGARDING RISK OF DANGER:**  Dalia Valencia's release will not pose a danger to the safety of any other person or the community. Dalia Valencia is a 48-year-old mature woman, who is passive and have never had any issues with the law until she was charged with this offense. Her crime does not reflect that she had substantial participation in the crime, contrary, her participation was minimal. Her release will not jeopardize the life of others. Upon release, at the age of 48, Ms. Valencia does not pose any risk of danger to the society or threat to public safety. Her exemplary record of participation in self-help vocational and educational programs while in prison demonstrate her truly desire to rehabilitate and realistic plans up on release.

## V.   "MS. VALENCIA'S REMARK"

Today, after near 5-years of incarceration, I Dalia Valencia humbly would like to express what has been my experience based on the circumstances of what took place in 2015 at the time of my arrest.  I, Dalia Valencia, urge that the passing of near 5-years has done little to dim the memory or significance of my acts. For 5-years of my life I have carried a level of remorse and regret for causing my children and loved ones the shame of my actions.  It sickens me to look back knowing that I cannot change my pass, however, I sincerely desire to cure as much as possible by

demonstrating that I have changed.  My life has been dramatically and eternally altered by my previous decisions.

I cannot ask for compassion for obvious reasons, because sometimes even I refrain to grant myself such a significant gesture considering the significance of my offense. However, it is worth exposing that for the past 5-years of my life I have made plans and have waited for that day in which I can give back what I took from the community, to demonstrate how harsh things have been for me as a mother of three children, and how much life has changed me through all this years.

Now things are very different, at the age of 48-years, despite the pain I have caused to my children, my children love me and are fully supportive even when I face near one-and-half decade prison term. Now I walk in the hands of Christ and proudly dedicate myself to help others in need, my transition is in good faith and has provide me the opportunity of servitude and opportunity to change my life.

I fully agree that forgiveness is a significant gesture, and only comes to those who truly seek change. Through this petition, I present my desire to humbly expose my transition in life, as I am no longer immature. For 5-year of my life my behavior while incarcerated represents my desire to rehabilitate. My life has been dramatically and eternally altered by my decision to become a follower of Jesus Christ. For many years I have demonstrated to be a woman of honor, a consistent leader among the Christian Church in prison. I believe in God, and indeed in rehabilitation of not only the soul by the mind.

I will not ask this court for full release from custody, because I fully understand that such a thing is simply unrealistic, however, I propose to be maintained in probation for the rest of what is left of my life.

I humbly ask for mercy in the form being release on home confinement and/or adjustment of my sentence or transferring my sentence from 180-months of physical custody to especial probation so I can further my vision and see it to development.

I pray that this honorable court hear me and provide relief in the form of a less harsh punishment. I don't what to spend more time away from my children behind walls, I am a woman of honor and as such, humbly pray not to be stripped from the

benefit of being a wife, mother as a free person, surrounded by my loved ones. Please hear my prayers and exercise compassion.


**WHEREFORE,** Dalia Valencia, respectfully pray that this honorable court find worthy of its mercy and grace and grant her relief in the form of compelling the prison warden at Carswell Federal Medical Center to Release her on Home Confinement or this honorable court transforming her physical custody to special probation custody.


Executed and Signed this 20th day of _April_____, 2020


                                                     Respectfully Submitted

## CERTIFICATE OF SERVICE

I, Dalia Valencia, hereby certify under penalty of perjury, that on this April 20, 2020, I placed a copy of the foregoing Motion for Reduction of Sentence in a Mailbox at the Carlswell Federal Medical Center affixed and with sufficient postage. A copy of the same was served to the United States Attorney's office for the Western District of Texas.

Respectfully Submitted

Dalia Valencia

**Pro se Litigant:**

Dalia Valencia
Reg No. 59005-380
**FEDERAL MEDICAL CENTER**
P.O. Box 27137
FORT WORTH, TX 76127

23