FILED

DALIA VALENCIA
Reg No. 59005-380
FEDERAL MEDICAL CENTER (CARSWELL)
P.O. BOX 27137
FORT WORTH, TX. 76127

AUG 2 1 2020

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

## IN THE UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

## EL PASO DIVISION

| | |
|---|---|
| DALIA VALENCIA, | ) |
| Petitioner, | ) |
| | ) Case No. 3:15-CR-00228-DB |
| Vs. | ) Civil No. _____ |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| MICHAEL CARR, in his capacity as | ) |
| Warden of FMC, Carswell; and MICHAEL | ) |
| CARVAJAL, in his capacity as Director of | ) |
| The Bureau of Prisons, | ) |
| Respondents. | ) |

**NOTICE OF MOTION AND MOTION FOR REDUCTION OF SENTENCE (COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. 3582(C)(1)(A).**

**COMPLAINT— FOR DECLARATORY AND INJUNCTIVE RELIEF 28 U.S.C. § 1331 AND PETITION FOR EMERGENCY RELIEF UNDER THE EXTRAORDINARY DANGEROUS NATURE OF THE COVID-19 OUTBREAK AMONG FEDERAL PRISON POPULATION**

Immediate Relief Requested

1

**DALIA VALENCIA ("Valencia")**, hereby acting Pro se respectfully submit this Complaint for Declaratory and Injunctive Relief Pursuant to 28 U.S.C. 1331 and also Invokes 18 U.S.C. 3582(C)(1)(A) to present that if she cannot be held in custody constitutionally, for release under the First Step Act (Compassionate Release) and/or House Confinement under the CARES Act (Confinement Provision.). Valencia invoked the intervention of this Honorable Court and presents that even after U.S. District Attorney's Memorandum granting Wardens to release inmates under certain criteria, Warden at FMC, Carswell refuses to release a sufficient if not minimum number of inmates to House Confinement even after the crisis and health catastrophe developed at FMC, Carswell which jeopardizes Ms. Valencia's life and wellbeing being that she is a prisoner at Federal Medical Facility (Carswell

The present petition is founded based upon  Ms. Valencia's medical condition being Hypertension and shortness of breath, PTSD, Anxiety and the imminent exposure to contracting Covid-19 at FMC, Carswell, and the Extraordinary Nature of the COVID-19 Outbreak Among Federal Prison Population underlining that more than 510 women at a federal medical prison in Texas have tested positive for the coronavirus, in one of the largest confirmed outbreaks at a federal prison, the Bureau of Prisons. FMC-Carswell holds female inmates with medical and mental health issues. It currently has 1,357 prisoners.

The Federal Bureau of Prisons ("BOP")(FMC, Carswell) is mismanaging one of the worst public health catastrophes related to COVID-19 anywhere in the country— and at the epicenter of the outbreak is FMC, Carswell where more than half of incarcerated woman inmates have tested positive for COVID.

## I . EXHAUSTION OF ADMINISTRATIVE REMEDY

On April 21, 2020, Ms. Valencia filed her Petition For House Confinement Release to the institution Warden at the FCM, Carswell. **See Exhibit A.** On this July 29, 2020, the prison warden has opted for waiving response in this matter. Now through this emergency motion, Mr. Valencia invokes Court's intervention and relief as this court deem appropriate.

Mr. Valencia presents that petitioner may bring a motion of this nature "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Accordingly, A petitioner seeking compassionate release is generally required exhaust his or her administrative remedies prior to bringing a motion before the district court. Id. However, the exhaustion requirement may be waived under the following circumstances: (1) the relief sought would be futile upon exhaustion; (2) exhaustion via the agency review process would result in inadequate relief; or (3) pursuit of agency review would subject the petitioner to undue prejudice. United States v. Zukerman, 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020) citing Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019). The COVID-19 pandemic, which could result in catastrophic health consequences for petitioners vulnerable to infection, implicates all three exceptions justifying the waiver of the exhaustion requirement. Miller v. United States, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020); Zukerman, 2020 WL 1659880, at *3; United States v. Perez, 2020 WL 1456422, at *3-4 (S.D.N.Y. Apr. 1, 2020); United States v. Gonzalez, 2020 WL 1536155, at *2 (E.D. Wash. Mar. 31, 2020).

Although, Ms. Valencia is fully knowledgeable that it is for the FBOP to assign place of confinement and is for the FBOP based on the U.S. Attorney General Memorandum to select who is entitle to House Confinement relief, yet, the intervention of this court is invoked when place of confinement violates constitutional rights to those incarcerated while in custody.


## II    BACKGROUND


On or about October 28, 2015, Dalia Valencia was charged in a Fourth Superseding Indictment in the above-styled numbered causes. Ms. Valencia later agreed to enter a plea of guilty in case number EP-15-CR-228, to one count of conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity. Ms. Valencia

3

further agreed to plead guilty to one count information charging Ms. Valencia with theft of public money. In exchange the government agreed to move for dismissal of the remaining counts of the Fourth Superseding Indictment in cause number EP-15-CR-228. The government further agreed to move for dismissal of the First Superseding Indictment and the original indictment in EP-15-CR-1646 that had also been pending against Ms. Valencia.

In addition, Ms. Valencia was required to plead to a notice of special sentencing factors relevant to the Fourth Superseding Indictment. Specifically, Ms. Valencia agreed she conspired to possess a controlled substance, which involved 1,000 kilograms or more of marijuana with intent to distribute. In addition to that, the plea agreement between Ms. Valencia and the government contained an 11 (c) (1)(C) agreement recommending that Ms. Valencia not be sentenced to a term greater than 180 months (15 years). The government further agreed to move for dismissal of the indictment pending against Josefine Gurrola in EP-16-CR-342, and to make a recommendation of a binding recommendation as to Josefine Gurrola, that the sentence be time-served. Also, in exchange, the government agreed it would not prosecute Jesus Valencia, son of Ms. Valencia, for his actions involving the concealment of Monica Velasco on or about January 25th, 2016, through February 5th 2016.

At sentencing---under RICO, Group One and Group Two, Ms. Valencia was found to be a 38, plus 2 for active participant and money laundering with 3 levels, which gave a total calculation of 43. From there, there was 2 points added for the multiple count adjustment and 3 taken away for acceptance of responsibility which made the total offense level 42 and required a sentence of 360 months to life imprisonment. However, the Court recognized, and accepted Ms. Valencia's plea agreement called for a sentence of not more than 180 months on the Rico charge.

## III    RELEVANT FACTS FOR RELIEF

Ms. Dalia Valencia is obligated to bring this emergency petition seeking court

4

intervention because Warden at FMC, Carswell has acted outside the scope of his responsibilities in allowing house confinement release to those inmates exposed to the virus even after FMC, Carswell has become a site of a national catastrophe.

Warden of FMC, Carswell has demonstrated that he will not take the measures necessary to prevent the coronavirus from converting more prison sentences into death sentences without court intervention. Public health experts have been clear—to prevent the disease from spreading and reduce the burden on prison medical resources, Warden has failed to conduct testing in time for isolation to be effective, provide adequate personal protective equipment ("PPE"), properly treat and monitor those who are sick, and most importantly, reduce the prison population to allow for adequate social distancing and sufficient access to medical care.

As part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Congress modified 18 U.S.C. § 3624(c) to enable BOP to do just that—section 12003(b)(2) of the CARES Act gave Warden and the BOP the broad discretion to allow home confinement and reduce crowding at prisons during the COVID-19 emergency period. Despite this and the guidance of Attorney General William Barr urging the BOP to immediately transfer medically "at-risk" prisoners to home confinement, Warden ay FMC, Carswell is refusing to consider home confinement for the vast majority of those incarcerated at that prison. At the same time, Warden has failed to conduct timely testing, provide adequate PPE, or effectively isolation to those who are infected and those who have had contact with the infected. The recent round of mass testing was helpful only to prove just how ineffective BOP's policies have been. For many, the actions and inactions of Warden will lead to a death sentence. This deliberate indifference amounts to cruel and unusual punishment prohibited by the Eighth Amendment.

In the case at hand Warden instead of using the power granted to BOP by Congress under the CARES Act to release Ms. Valencia early to home confinement, thereby reducing the risk to her, Warden is arbitrarily forcing her to spend the rest of her physical custody at FMC, Carswell, in a hastily-converted warehouse, where she is locked in a cell and not even allowed to shower. Due to the burden on FMC, Carswell's medical resources from COVID-19-related care, Ms. Valencia cannot get treatment for her PTSD, Anxiety Attacks and Hypertension. To make matters

worse, FMC, Carswell is one of the few BOP facilities that has made the unusual decision to severely restrict access to phone and email for prisoners under the guise of preventing the spread of the virus. Ms. Valencia has barely been able to access phones to ask for help from her family members. State jails and most other federal facilities have not implemented similar restrictions on communication with the outside world, and in fact, some state jails are permitting free phone calls due to bans on in-person visiting.

Warden and his ineffectual and unnecessarily cruel policy of isolating positive cases in solitary confinement and unsanitary makeshift living spaces has completely failed to stop or even slow the spread of the virus. Having failed to prevent the outbreak, Warden cannot now be trusted to provide those who have tested positive with proper medical treatment or to protect those who remain uninfected from infection. Nor are there indications that Warden is adapting quickly and learning from his mistakes. Somehow, a month and a half since the first BOP prisoner in the country tested positive and a week after the numbers from FMC, Carswell demonstrated how quickly the virus had spread at a nearby facility with shared resources, FMC, Carswell still has not tested the nearly half prisoners housed at the facility. Moreover, prisoners are still going without basic supplies like soap, hand sanitizer, and face masks.

Ms. Valencia cannot afford to wait and see if Warden respond to her petition for Home Confinement even after the 30-days mandated by law have elapsed, or if Warden will be able to handle the treatment of coronavirus any better than he handled the prevention of its spread. Already, the media is reporting that Warden is mishandling medical treatment in the same manner in which they mishandled prevention.

Unless immediate action is taken to ensure that FMC, Carswell provides proper medical care to those infected and implements measures to protect those who are not yet infected, including by reducing the size of the incarcerated population, soon, substantially all incarcerated people at FMC, Carswell—many of whom are especially vulnerable due to underlying medical conditions—will be infected with COVID-19. More will die. Warden at FMC, Carswell should take immediate steps to dramatically downsize the population at that prison.

Accordingly,  Ms, Dalia Valencia, on behalf of herself and a class of all persons incarcerated at FMC, Carswell now and in the future, bring this action for declaratory and injunctive relief, for enlargement of custody to include home confinement, and ultimately, if they cannot be held in custody constitutionally, for release.

### IV          JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Petitioners seek relief from being held in custody in violation of the Eighth Amendment to the U.S. Constitution, for relief from conditions of confinement that are in violation of the Eighth Amendment.

The Court has subject-matter jurisdiction over this Petition pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 of the Administrative Procedure and Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause). In addition, the Court has jurisdiction to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continues to occur in this district. And because this court sentenced Ms. Valencia.

This Court has personal jurisdiction over Warden because at all times relevant to this action, Warden has been employed at FMC, Carswell, and all the actions and omissions at issue occurred at FMC, Carswell. This Court has personal jurisdiction over Warden because at all times relevant to this action, he has set BOP policies and issued guidance that Warden has applied at FMC, Carswell, a federal prison in Fort Worth, Texas, for female inmates with special and mental health needs, operated by the Federal Bureau of Prisons (BOP).

7

## V.        FACTUAL ALLEGATIONS

### A. The COVID-19 Crisis.

The novel coronavirus that causes COVID-19 has led to a global pandemic. As of May 15, 2020, worldwide there are over 4.3 million reported COVID-19 cases and 297,241 confirmed deaths. In the United States, the case count stands at 1,412,121 and the death count at 85,990.

In Texas, there are currently 376,104 + 9,507 confirmed cases of coronavirus. There are 4,714 fatalities. Dallas County has been epicenter of the pandemic in Texas, with 44,087 cases and 579 deaths.

The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects. Infected people can spread the virus to others even if they are asymptomatic, such that simply avoiding people who are coughing or visibly feverish is insufficient.

According to the CDC, people who suffer from certain underlying medical conditions face elevated risk. Such conditions include chronic lung disease, moderate to severe asthma, serious heart conditions, hypertension, high blood pressure, chronic kidney disease, liver disease, diabetes, compromised immune systems (such as from cancer treatment, HIV, autoimmune disease, or use of immunosuppressing medication for other conditions), and severe obesity. One analysis found mortality rates of 13.2% for patients with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.

The risk of illness or death from COVID-19 is increased for older populations. In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3%, those age 60-69 had an overall 3.6% mortality rate, and those age 70-79 had an 8% mortality rate.

In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe. Most people in

8

higher-risk categories who develop serious illness will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-topatient ratios, respiratory therapists, and intensive-care physicians.

In patients who do not die, COVID-19 can severely damage lung tissue, requiring an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called "myocarditis," or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days.

Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.

The estimated fatality rate associated with COVID-19 has been estimated to range from 0.1 to 6 percent, meaning COVID-19 may be as much as 35 times more fatal than seasonal influenza. Although many people who contract COVID-19 will exhibit relatively mild symptoms, the virus will manifest in some 20 percent of cases as a "more severe disease requiring medical intervention and support.

There is no vaccine against COVID-19 and there is no known medication to prevent or treat infection from COVID-19. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including frequently and thoroughly washing hands with soap and water and cleaning and disinfecting high-touch surfaces, are the only known effective measures for

protecting people from COVID-19.26 This is especially significant because the virus can spread through people who appear asymptomatic.

On March 19, 2020, Dr. John Hellerstedt, commissioner of DSHS, declared a public health disaster in Texas, because COVID-19 "has created an immediate threat, poses a high risk of death to a large number of people, and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas."

On March 24, 2020, Governor Abbott issued Executive Order requiring all Texas residents to "stay home or at their place of residence" unless the resident works in critical infrastructure sectors.

Local officials have also taken extraordinary measures aimed at slowing the virus's spread. For example, "Safer at Home" order ordering residents of the Texas state to remain in their homes with lawful exceptions for critical tasks such as securing food and health, safety and medical necessities.  A "Safer at Home" order under lined and prohibited all indoor public and private gatherings and all outdoor public and private events within a confined space where at least 10 people were expected to be in attendance at the same time. The state of Texas Order prohibit all gatherings and events, and will be extended through at least August.


B. <u>Incarcerated People and Staff Are Particularly Vulnerable.</u>


People in environments with confined spaces such as correctional facilities, where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes. The close quarters and limited freedom of movement inherent in correctional facilities makes social distancing and other preventive measures difficult or impossible. Moreover, the ability of incarcerated people to adopt preventative measures is completely subject to the dictates of correctional officials who control the housing, schedules, sanitary supplies, and nearly every other aspect of their lives.

Correctional facilities increase the risk of rapid spread of an infectious disease, like

COVID-19, because of the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.

The CDC has issued guidance urging prison administrators to take action to prevent overcrowding of correctional and detention facilities during a community outbreak. The CDC guidance emphasizes that social distancing is "a cornerstone of reducing transmission of respiratory disease such as COVID-19." It calls not only for social distancing, but also measures for isolating and quarantining detainees and staff who have (or are suspected of having) COVID- 19 from those who do not have (or presumably do not have) the virus.

Many correctional facilities find implementation of these preventive strategies challenging without a significant reduction in prison populations.

As a general matter, correctional facilities frequently lack sufficient medical supplies for the population, and, in times of crisis, medical staff may cease coming to the facilities. Hot water, soap, and paper towels are often in limited supply. Incarcerated people themselves, rather than professional cleaners, are often responsible for cleaning the facilities and often are not given appropriate supplies. This means there are more people who are susceptible to infection all congregated together in a location where fighting the spread of an infection is nearly impossible.

For these reasons, correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19. Exercising authority to enlarge custody to include home confinement or release detainees protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and it also allows for greater risk mitigation for all people held or working in a prison, jail, or detention center. Release of the most vulnerable people from custody also reduces the burden on the region's health-care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. "BOP should take immediate steps to dramatically downsize the population at FMC, Carswell, with priority given to those at high risk of harm due to their age and health status and thus are likely to require a disproportionate amount of medical resources.

11

Had Warden similarly reduced the population at FMC, Carswell as called for by the science, the catastrophe we are faced with today may have been avoided. Because they did not, the outbreak at FMC, Carswell is now out of control. This not only poses an unacceptable risk to the health and safety of the incarcerated, but also burdens local hospitals and thus endangers the broader community. Correctional facilities lack adequate medical facilities to treat serious COVID-19 cases, so an outbreak in a prison could overwhelm local hospitals. And as correctional staff enter and leave the facility, they will carry the virus with them. Like the incarcerated people in the facilities where they work, correctional officers face an increased risk of COVID-19 exposure because they are less able to engage in social distancing and because of the shortage of personal protective equipment, also known as PPE. Indeed, as of May 3, the BOP had reported 498 confirmed past and present infections among its prison staff nationwide.

Given these dangers, on an accelerating basis since mid-March of this year, courts in this Circuit and across the country have ordered the release of prisoners and detainees in response to the COVID-19 crisis.

When the dangers of COVID-19 have reached a level where a prison is no longer able to incarcerate its population in constitutional conditions, courts have granted emergency habeas relief for entire classes of prisoners to be evaluated for enlargement of custody on an accelerated basis.

## C. FMC, Carswell's Failure to Slow the Spread of its COVID-19 Outbreak Has Allowed the Virus to Spread Like Wildfire.

The numbers speak for themselves: Warden have lost control of the COVID-19 outbreak at FMC, Carswell entirely. There are over 510 positive COVID-19 cases at the FMC, Carswell among a population of approximately 1,300, almost half population and more than many entire cities in the state of Texas.

This sad reality is borne out by the information prisoners have relayed to family

12

members and friends despite FMC, Carswell's best efforts to keep them silenced. Since April 16, 2020, the prison has cut off most communications with the outsideworld, forcing prisoners to communicate with their loved ones only through letters and, since around May 9, sporadic five-minute phone calls.

Counsel for Ms. Valencia have attempted to arrange legal calls at FMC, and had been identified to counsel by their family members and friends as seeking representation in this action. Counsel have not spoken with Ms. Valencia. Although several calls were initially scheduled, they were each abruptly cancelled by the BOP. As of now, there are no legal calls scheduled with Ms. Valencia.

Whatever Warden may say, the facts demonstrate that he had no strategy at all for addressing the virus. As late as late March and early April, when the world outside had already shuttered schools and businesses for weeks, FMC, Carswell simply ignored sick prisoners and left them in place to infect others, or approached isolation by simply hauling infected people into solitary confinement (the Special Housing Unit, or "SHU")—something ordinarily done as punishment—to forget about them entirely. Prisoners displaying symptoms of COVID-19 were left in solitary with no medical attention for days at a time. This deterred other prisoners from reporting symptoms lest they also be placed into solitary. Afterwards, as the number of positive cases grew, prison authorities began to isolate the infected in a variety of temporary housing units, such as dormitories that had previously been closed due to mold contamination, and hastily-converted warehouses. All of FMC, Carswell prisoner housing units were placed on total lockdown, confining prisoners to their cells or dormitories for most of the day. This heavy-handed isolation strategy has been a complete failure, for four reasons.

1. **Even with Many Prisoners Moved to Temporary Housing, Social Distancing is Impossible in FMC, Carswell's Dormitories and Cells.**

Hundreds of people held at the FMC, Carswell, live in cells. Due to the influx of prisoners from the dormitories, tiny single-occupancy cells are now occupied by two prisoners at a time. Due to the facility-wide lockdown, prisoners are unable to leave

their cells to take a shower or change into clean clothes. Air conditioning and ventilation is extremely poor and inmates sleep 3-feet apart from each other.

When inmates are allowed to use the phones they stand on line les than 2-feet from each other, and phones are unsatiated. They are expected to wear the same face mask for weeks, and the lack of hand sanitizer and soap makes the spread imminent.

## 2. Unsanitary Conditions in Temporary Housing Units Offer Fertile Ground for the Other Diseases to Spread.

The conditions in the temporary housing units are appalling and are putting the lives of those who have tested positive in further danger. COVID -19 Unit — a dormitory that had been closed years prior due to mold contamination—was reopened filled with prisoners without proper cleaning, and prisoners were forced to sleep on mattresses which the guards had scattered across the dirty floor. In the warehouses that had been hastily converted into blocks of double-occupancy cells, prisoners were not permitted to leave their cells to shower, and were not given clean clothes.

## 3. The Frequent Movement of Prisoners Combined with Lack of Adequate Testing Is Accelerating the Spread of the Virus

As discussed supra, FMC, Carswell heavy-handed isolation strategy has resulted in a large numbers of prisoners moving from minimum security dormitories to temporary housing units and prison cells same as USP facilities. In a belated effort to segregate FMC, Carswell infected population from its healthy and recovered population, Warden is moving inmates back and forth between housing units, transferring them from one place to another when they are sick, and then either sending them back or transferring them to yet another place when they are deemed "recovered."

Due to Warden's inadequate testing policies, their isolation strategy has been

14

rendered completely ineffectual. Over a month since its outbreak initially started, Carswell still does not have the capacity to fully test its entire population. Instead, Warden do not test prisoners at Carswell until they display symptoms, and sometimes not until several days after that, when their health has already deteriorated precipitously. In addition, prisoners are not re-tested and confirmed to be negative before being returned to housing units meant to be populated with non-infected prisoners, a practice explicitly "problematic." Some prisoners have simply been never tested at all.

Infected individuals can spread COVID-19 even when they are completely asymptomatic. As a result, the lack of asymptomatic testing and reentry testing means that Carswell is likely allowing infected prisoners to remain with healthy populations and spread the virus, and then allowing prisoners who are not fully recovered but asymptomatic to return to those populations and spread the virus again.

### 4. Carswell's Inadequate Efforts at Isolation Ignore Other Fundamental Areas of Infection Prevention.

As Carswell isolates its prisoners in crowded, unsanitary confines, it has failed to take any of the most basic measures necessary to ensure that the virus does not spread in these confines unabated. Since the outbreak started, Carswell has distributed only one face mask to prisoners, who have been forced to reuse it indefinitely. Not only do prisoners not have access to hand sanitizer, there are often shortages of soap. Due to the total lockdown, many prisoners are not even able to use the shower. Given that the pervasive lack of testing at Carswell likely means that even "healthy" housing units have at least a few infected prisoners, this lack of baseline protective measures more or less ensures that those few will eventually becoming many—as the alarming rate of growth in positive cases at Carswell is demonstrating.

### D. FMC, Carswell Is A Medical Facility Incapable of Providing Adequate Medical Care for COVID-19 Patients, Posing an Unconstitutional Threat Both to the Incarcerated and to the Local Community.

Providing adequate medical care in the face of an outbreak of this size would be challenging for any community. For a prison like Carswell, it is an impossibility. The medical facilities at Carswell consist of only "a small medical bay capable of caring for a few patients." Although, FMC, Carswell has been classified as a medical facility capable of housing and providing medical care to dose inmates in critical conditions nationwide, care units are simply not equipped for this outbreak. In reality converted warehouse—has been little more than an exercise in public relations: the isolation housing unit lacks any ventilators and is "not properly equipped to handle serious COVID-19 cases. "BOP has not yet actually staffed the FMC, Carswell with proper doctors and nurses, and local health officials have remarked that as of May 8, it was "unclear whether the Medical Unit designed for Covid-19 cases is in fact operational." In lieu of adequate care —rendered impossible due to a serious lack of medical resources—prison authorities at Carswell have adopted a chilling indifference towards those affected by COVID-19.

FMC, Carswell if a medical facility, all inmates are female with metical health issues, the expectations of family members is that their family members in custody are being treated fairly and in abeyance to their constitutional rights.

Sadly, this is not the case inside a medical facility which main purpose is to care for those inmates that mostly are in need of medical attention.

Petitioner Ms. Valencia shares a tiny, single-occupancy cell with four cellmate at FMC, Carswell. Ms. Valencia suffers from hypertension, anxiety, PTSD and respiratory difficulties, which makes her especially vulnerable to COVID-19. On April 24, 2020, she wrote to her family that she was feeling very sick and was concerned that she may have COVID-19. Six days later, Ms. Valencia's family received a letter from her stating that she had suffered from fever, diarrhea, and body aches, and had been asking the guards for medical assistance for five days but

was completely ignored. She was not checked or taken to the hospital even after every prisoner in her block began to bang on their cell walls in unison to demand that she be taken care of. She was simply ignored, and she simply opted to rest for more than a week. For a week she was partially having her meals. Meals that for more than a mount constituted of bologna sandwiches and cereal in the mornings.

The story of Ms. Valencia is not an isolated incident but part of a larger pattern of deliberate indifference to that shocks the conscience: at Carswell, medical care is now "limited or nonexistent[,]" and prisoners with COVID-19 are not tested or treated until they hit "rock bottom." Even when they test positive, they are not immediately isolated from other prisoners, sometimes being left in dormitories housing approximately 100 people for as long as 14 days.

Even when Warden actually identify COVID-19 patients, the treatment they provide resembles prison discipline more than medical care. In the event that an inmate is test positive, inmate not only have to deal with the pain caused by the virus, but also inmate is immediately placed in solitary confinement while they await results. While at solitary confinement inmate receives a temperature and symptom check from a doctor and then inmate is left to languish in solitary confinement, not allowed to see a doctor again.

As Ms. Valencia notes, "the record" "show[] that virtually no effort is being made at Carswell to monitor or treat prisoners, with staff waiting until the last minute to intervene," and also has significant ripple effects on even regular medical care for prisoners with conditions unrelated to COVID-19. This is precisely what is happening inside FMC, Carswell, as prison staff have stopped accepting requests for medical care from prisoners since the outbreak started. As a result, Petitioner Brown—who requires chemotherapy or surgery to treat his prostate cancer—and others similarly situated have been rendered unable to obtain the care they need to survive.

As the outbreak at Carswell rages on and the prison's medical resources deplete further still, the risk of infection to staff who go home to the community will

17

continue to rise. Every prisoner at a local hospital, in turn, must be guarded 24 hours a day by two correctional officers on eight-hour shifts, meaning each of these officers are returning to their homes and surrounding communities after long-term exposure to coronavirus patients.

The only solution is to reduce the prison population to the point where Carswell medical resources become sufficient to provide adequate care for those who remain.

### The Efforts of the Bureau of Prisons Are Inadequate.

The BOP has failed to respond effectively to the COVID-19 pandemic. The BOP failed to anticipate and prepare for the magnitude of the threat that COVID-19 poses to its own staff and the people it detains; it then failed to respond in any meaningful way to initial signs of uncontrolled outbreaks at several of its facilities across the country, including FMC, Carswell; and it has continued to fail to implement even the baseline measures that would assure the safety of its own staff, of Ms. Valencia and others incarcerated by the BOP, and of the communities into which staff and others travel on a daily basis.

The BOP's preparations were inadequate from the start. Initial guidance from the BOP was not issued until March 9, and it addressed only the possibility of telework for some employees at an agency where the vast majority of workers must physically appear at facilities to do their jobs, and it mentioned restrictions only for people who had traveled to already-impacted countries.

Moreover, the BOP did not make any changes to protocols that call for prisoners to purchase their own cleaning supplies from commissary—preventing many indigent and poor prisoners from being able to buy those supplies—and for them to maintain responsibility for cleaning and sanitizing their spaces (whether they have supplies or not).

In fact, as late as March 26—weeks after many cities and states had closed restaurants and non-essential businesses, restricted travel, and ordered people to shelter in place—the BOP Director announced that the BOP had merely taken an inventory of

18

soap, rather than taken steps to distribute it at no cost or even at a reduced cost.Among other failures that contributed to spread at BOP facilities, officers reported that even as of late March, they were given only gloves—not masks, face shields, or other PPE—when interacting with prisoners sick enough to require transport to the hospital. Those same officers were ordered back to the job in defiance of CDC guidance that called for self-isolation by correctional staff who had been exposed.

Unicor, an entity that runs prisoner work programs for the BOP, continued operating throughout the pandemic and did not began distributing masks to prisoner workers and correctional officers until about April 2, 2020.

Across facilities, the BOP has been "scrambling" to address staffing and resource needs. Despite this, the BOP has continued to limit the number of contractors who can supply PPE, does not have enough tests, and has been sued by its own staff for requiring them to work in hazardous working conditions.

When the BOP loses control at a facility, dozens of prisoners must go to local hospitals, straining the local healthcare infrastructure, as well. Even those figures are almost certainly an undercount. The BOP has repeatedly understated the scope of the problem and refused to take steps to assess the situation transparently. For example, the BOP has been artificially reducing their number of reported positive cases by classifying individuals who previously tested positive for COVID-19 but no longer showing symptoms as "recovered" and removing them from the count of positive cases, without re-testing them to confirm that the virus is no longer present in their bodies.

BOP's under-reporting of the outbreak at FCI Elkton provides another stark example of their lack of transparency. As of April 6, the BOP had reported eight prisoners and one staff had tested positive at FCI Elkton. Press accounts, however, reported that medical staffing had fallen to fifty percent of capacity, and that three prisoners had already died as of April 6.103 The full scope of the problem did not become clear until a federal judge ordered the facility to increase testing, after the BOP admitted that it only had 55 tests on hand for a facility of more than 2,400 prisoners.

Conditions had already deteriorated so thoroughly that Ohio Governor Mike DeWine called in the state's National Guard to FCI Elkton, a federal prison. At the press conference announcing that decision, Governor DeWine called on the BOP to stop sending new prisoners to Elkton. And the accuracy of the BOP's reporting of COVID-19 cases in Elkton is in doubt.

Ultimately, the U.S. District Court for the Northern District of Ohio ordered enlargement of custody for medically vulnerable prisoners at FCI Elkton pending resolution of a class habeas petition on the merits, because of the outbreak already raging at the facility.

Such conditions at numerous facilities across the country have led BOP employees, including corrections officers, to file a complaint with the Occupational Safety and Health Administration (OSHA) alleging unsafe conditions at numerous federal prisons nationwide, including Lompoc. Among other things, the officers' OSHA complaint points to the BOP having "directed staff through the Bureau of Prisons who have come in contact with, or been in close proximity to, prisoners who show or have shown symptoms of COVID-19, to report to work and not be self-quarantined for 14 days per the CDC guidelines." It also complains of the BOP having failed to undertake any workplace or administrative controls to address transmission, to require social distancing or other measures in the CDC guidance, or to provide sufficient PPE.

In apparent response, the BOP released a short document titled "Correcting Myths and Misinformation about BOP and COVID-19."110 In responding to the assertion that staff who had been in contact with prisoners who showed symptoms of COVID-19 still had to come to work, the BOP simply confirmed that such employees were required to come to work, with masks.

CARES Act, signed into law on March 27, makes funding available for federal prisons to purchase PPE and test kits for COVID-19 in addition to authorizing the Department of Justice to lengthen the maximum amount of time that a prisoner can be placed in home confinement during the pandemic, as discussed above.112 Acting under that authority, Attorney General Barr made a finding that emergency conditions are materially affecting the functioning of the BOP, and on April 3 he

directed Respondent Carvajal to review prisoners with COVID-19 risk factors to determine their eligibility for home confinement, stating that the BOP's efforts to prevent COVID-19 from entering BOP facilities and infecting prisoners have "not been perfectly successful at all institutions.

Attorney General Barr also released guidance in the form of a series of letters suggesting that some BOP prisoners should be released.114 Those letters merely encourage the BOP to exercise discretion that it has declined to use, and they do not actually direct the release of categories of prisoners, much less on a scale that would allow for safe social distancing in the facilities or with the speed that the health crisis requires. Of the relatively small number of people released, the BOP has not reported the number who subsequently died.

The BOP's April 22 guidance gave wardens virtually unchecked discretion to deny a request for release and imposes unnecessary and arbitrary barriers on prisoners seeking release. For example, pursuant to the BOP's guidance from April 22: (i) prisoners must have had no disciplinary infractions of any kind for 12 months; (ii) prisoners must provide verification that they would have a lower risk of contracting COVID-19 outside the prison than inside of it, and, (iii) prisoners with any on-going medical care must show their medical needs can be met outside the prison, and that they have a 90-day supply of prescribed medications. After reports of positive cases continued to explode, on May 8, 2020, BOP amended this guidance to relax a few criteria, but it continues to be far more restrictive than the recommendations proposed by Attorney General Barr.

The BOP's April 22 guidance gives wardens virtually unchecked discretion to deny a request for release and imposes unnecessary and impractical barriers on prisoners seeking release. For example, pursuant to the BOP's guidance: (i) prisoners must have had no disciplinary infractions of any kind for 12 months; (ii) prisoners must provide verification that they would have a lower risk of contracting COVID-19 outside the prison than inside of it, and, (iii) prisoners with any on-going medical care must show their medical needs can be met outside the prison, and that they have a 90-day supply of prescribed medications.

The appalling conditions of BOP facilities across the country, and the BOP's

failures to address the constitutional rights of prisoners in its care, have forced federal courts to address BOP failures in a large number of individual cases seeking compassionate release115; bail pending appeal, trial, or sentencing116; delayed self-surrender117; writs of habeas corpus118; class-wide relief for groups of prisoners119; and furloughs.

As noted, the Northern District of Ohio ordered FCI Elkton to release potentially hundreds of medically vulnerable prisoners who face a greater threat from COVID-19. It did this because Elkton had "altogether failed" to follow CDC guidance for correctional settings, and that the measures were "necessary to stop the spread of the virus and save lives."121 Similarly, the District of Connecticut has ordered FCI Danbury to evaluate and release medically vulnerable inmates on an accelerated basis.

## LEGAL GROUNDS FOR PETITION

### A. Warden and Director of BOP's Failure to Take Steps to Mitigate Transmission of COVID-19 Constitutes Deliberate Indifference to the Serious Medical Needs of Ms. Valencia.

Warden and Director of BOP are violating Ms. Valencia's Eighth Amendment rights by continuing to incarcerate them in conditions that place them at substantial risk of serious harm from transmission of an infectious and deadly disease, especially considering Ms. Valencias' vulnerable conditions.

All individuals held at Carswell have been convicted and assigned by the BOP to serve time at Carswell. Therefore, the treatment of all individuals incarcerated at Carswell, including the treatment of Ms. Valencia, is governed by the Eighth Amendment. See Ray v. Mabry, 556 F.2d 881 (8th Cir. 1977); Woolsey v. Beto, 450 F.2d 321 (5th Cir. 1971), Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012). Many Circuits employs a two-part test in assessing whether prison officials have violated the Eighth Amendment by way of deliberately indifference to the medical needs of inmates: (1) the plaintiff must have "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further

significant injury or the unnecessary and wanton infliction of pain"; and (2) the defendants' "response to the need" must have been "deliberately indifferent.

Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." Helling v. McKinney, 509 U.S. 25, 33 (1993). This Court need not "await a tragic event" to find that Respondents are maintaining unconstitutional conditions of confinement. Id. at 32- 33. This is so not only because a tragedy is ongoing, but because even petitioners and class members who have not yet tested positive have a constitutional right to be free from conditions of confinement that "pose an unreasonable risk of serious damage to [Petitioner's] future health." Id. at 35.

Indeed, the threat of exposure to a deadly infectious disease such as COVID-19 and subsequent mistreatment due to lack of medical resources constitutes a serious risk to health, particularly for the Petitioners with unique vulnerability to COVID-19. See Helling, 509 U.S. at 34 (noting with approval Eighth Amendment claims based on exposure to serious contagious diseases); Unknown Parties v. Johnson, No. cv-15-00250, 2016 WL 8188563, at *15 (D. Ariz. Nov. 18, 2016), aff'd sub nom, Doe v. Kelly, 878 F.3d 710 (finding evidence of medical risks associated with . . .being exposed to communicable diseases" adequate to establish irreparable harm under the Eighth Amendment); Castillo v. Barr, — F. Supp. 3d —, 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) (in civil detainment context, ruling that officials could not "be deliberately indifferent to the potential exposure of civil detainees to a serious, communicable disease on the ground that the complaining detainee shows no serious current symptoms, or ignore a condition of confinement that is more than very likely to cause a serious illness").

As such, Petitioners are entitled to be protected from conditions of confinement that create a serious risk to health or safety, including through release from custody when necessary. Brown v. Plata, 563 U.S. 493, 531–32 (2011) (upholding lower court's order releasing people from state prison even though release was

based on prospect of future harm caused by prison overcrowding); see also Farmer v. Brennan, 511 U.S. 825, 834 (1994) (correctional official violates Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm").

Under FMC, Carswell's current conditions, Warden have not and cannot protect Ms. Valencia and other inmates from this well-known risk of serious harm. In these circumstances, enlargement of custody and, if necessary, release, is required to protect Ms. Valencia and other prisoners with high- risk health conditions from unconstitutional custody.

In this case, as established by the facts above, Ms. Valencia face a significant risk of exposure to COVID-19, with the attendant risk of death that follows given their vulnerable conditions. Warden is well aware of this risk, having been alerted to it by the CDC, the Attorney General, BOP guidance, widespread news reporting, and the ongoing outbreak at various BOP facilities including FMC, Carswell itself. Indeed, the Second Circuit Court of Appeals, unprompted, acknowledged over a month ago the "grave and enduring" risk posed by COVID-19 in the correctional context. Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons, No. 19-1778, – F.3d –, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

Finally, as established above, Warden and Director of BOP have not taken steps sufficient to protect Ms. Valencia from the grave risks that are present every moment she is incarcerated at Carswell. Respondent Warden Michael Carr has recklessly failed to follow or implement CDC guidance or directives from Attorney General Barr or the BOP. Warden and Director of BOP are not capable of managing the risk to Ms. Valencia in the facility's current environment. Warden and Director of BOP are holding Ms. Valencia in violation of her Eighth Amendment rights by detaining her in the face of significant threats to their health and safety without taking reasonable steps to prevent or address that harm

24

**B. Overcrowding Ensures That Ms. Valencia Cannot Implement Recommended Measures Required to Protect Her Health, and Violates the Eighth Amendment.**

Respondents are violating Petitioners' Eighth Amendment rights by continuing to incarcerate them in conditions that place them at substantial risk of serious harm from transmission of an infectious and deadly disease.

As alleged above, the BOP has thus far failed to implement effective social distancing across its facilities, including and particularly at Carswell, with disastrous effects. Part of this failure reflects the nature of correctional confinement; however, a large part here owes to the particular circumstances of Carswell's design, capacity, and deliberate choices about policies by Respondents.

In the midst of a pandemic, Respondents have chosen to maintain overcrowding at Carswell at a rate of 130% capacity. The profound and purposeful overcrowding Carswell ensures that effective social distancing is impossible, and it stymies Respondents' ability to follow and implement the CDC Interim Guidance and other viral-transmission prevention measures.

> Courts have long found that facilities' populations may exacerbate existing harms entirely unrelated to the fact of crowding itself, including cases where overcrowding may inhibit a facility's ability to mitigate incarcerated individuals' risk of contracting dangerous diseases. The Supreme Court itself has recognized that correctional defendants such as Respondents can violate the Eighth Amendment when they crowd prisoners into shared spaces with others who have "infectious maladies." Helling v. McKinney, 509 U.S. 25, 33 (1993); see also Hutto v. Finney, 437 U.S. 678, 682–85 (1978) (recognizing the need for a remedy where prisoners were crowded into cells and some had infectious diseases).

> Such decisions make particular sense in light of substantial corroborating evidence that transmission becomes more likely in light of, among other factors, relative crowding of people together. See, e.g., Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007) ("The

probability of transmission of potentially pathogenic organisms is increased [in jails and prisons] by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise."), available at https://bit.ly/2QZA494.

In this case, Petitioner faces an elevated risk of serious illness both because of particular failures on the part of Respondents as alleged above, and because Respondents have chosen to overcrowd the facility. The current population of Lompoc, both of incarcerated individuals and the staff who come through on a daily basis and work in the same confined space, ensures that any effective measures that would mitigate Petitioner's exposure to and risk of serious illness from COVID-19 are impossible to implement.

## C.    CIVIL ACTION FOR DECLARATORY RELIEF

Petitioners bring this action pursuant to 28 U.S.C. § 1331(a) and Declaratory Judgment Act, of 28 U.S.C. § 2201.

Several common questions of law and fact apply to all Class members. These common questions of fact and law include but are not limited to: (1) whether the conditions of confinement described in this Petition amount to constitutional violations; (2) what measures Warden and Director BOP have taken and are taking in response to the COVID-19 crisis; (3) whether Warden and Director of BOP have implemented and are implementing an adequate emergency plan during the COVID-19 crisis; (4) whether Warden and Director of BOP practices during the COVID-19 crisis have exposed and are exposing prisoners at Carswell to a substantial risk of serious harm; (5) whether the Warden and the Director of BOP have known of and disregarded a substantial risk of serious harm to the safety and health of Ms. Valencia and other inmates; and (6) what relief should be awarded to redress the harms suffered by Ms. Valencia as a result of the conditions.

Absent classification certification, individuals incarcerated at Carswell during the COVID- 19 pandemic would face a series of barriers in accessing the relief sought. Carswell has suspended visitation, and individuals incarcerated there have limited access to communication with the outside world, impeding their ability to obtain legal representation and pursue litigation. Because Ms. Valencia has been sentenced, she does not have defense attorney.

Ms. Valencia presents that she is being held in unconstitutional custody at FMC, Carswell.  Ms. Valencia has at least one underlying condition that enhance her risk of serious illness or death from COVID-19 reason why she was place at that particular medical facility.

### D.                     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### (Eighth Amendment)

Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution 28 U.S.C. § 2241/28 U.S.C. § 2243.

The Eighth Amendment guarantees sentenced prisoners' custody free of "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." Helling, 509 U.S. at 33; see also U.S. Const. Amend VIII. The government's failure to protect the prisoners in its custody from a widespread outbreak of a serious contagious disease that causes potentially permanent damage or death constitutes deliberate indifference in violation of the Eighth Amendment to the United States Constitution.

Ms. Valencia is at severe risk of contracting COVID-19 because 510 of prisoners have already tested positive. Ms. Valencia is uniquely vulnerable to serious complications or death from contracting COVID-19 because of her age and/or because she suffers from medical conditions that render her uniquely vulnerable.

Because of the conditions at Carswell, Ms. Valencia cannot take steps to protect

herself—such as social distancing, hand-washing hygiene, or self-quarantining—and the government has not provided adequate protections. As COVID-19 rapidly spreads inside Carswell, the already deplorable conditions at the prison will continue to deteriorate, and incarcerated individuals there will continue to contract COVID-19 at staggering rates. Due to inadequate medical care at Carswell, the health and safety of those who contract COVID-19 will be put in unconstitutional danger. (Under lining that Carswell is a Medical Facility).

Ms. Valencia contend that the fact her confinement in prison itself amounts to an Eighth Amendment violation under these circumstances, and nothing short of an order ending her confinement at Carswell will alleviate that violation.

Warden and Director of BOP's failure to adequately protect Ms. Valencia from these unconstitutional conditions, or release her from the conditions altogether, constitutes deliberate indifference to a substantial risk of serious harm to Ms. Valencia, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

Warden and Director of BOP were aware or should have been aware of these conditions, which were and are open and obvious throughout the entire prison

Warden and Director of BOP knew of and disregarded an excessive risk to health and safety.

Warden and Director of BOP failed to act with reasonable care to mitigate these risks, subjecting Ms. Valencia to a grave and serious risk of harm of serious illness, permanent injury, or death.

Because Warden and Director of BOP failed to act to remedy Ms. Valencia degrading and inhumane conditions of confinement in violation of their Eighth Amendment rights, Ms. Valencia seek relief under this Writ of Habeas Corpus Petition and Complaint. Because of the unlawful conduct of Warden and Director of BOP, Ms. Valencia is threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.

E.                SECOND CLAIM FOR RELIEF

(Eighth Amendment)

Injunctive Relief Only

Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution.

U.S. Const, Amend. VIII; 28 U.S.C. § 1331; 5 U.S.C. § 702

Ms. Valencia Versus All Defendants in their Official Capacities

Ms. Valencia's incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

Ms. Valencia bring this claim on her own behalf and on behalf.

This claim does not seek the release of Ms. Valencia and accordingly is well maintained pursuant to 28 U.S.C. § 1331. However, it is well established that individuals may sue to enjoin constitutional violations, either directly under the Constitution or under the Administrative Procedure Act. See Sierra Club v. Trump, 929 F.3d 670, 694 (9th Cir. 2019) ("Plaintiffs may bring their challenge through an equitable action to enjoin unconstitutional official conduct, or under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., as a challenge to a final agency decision that is alleged to violate the Constitution, or both."); Fazaga v. FBI, 916 F.3d 1202, 1239– 1241 (9th Cir. 2019) (permitting claims against federal officials in their official capacities for injunctive relief directly under the Fourth Amendment, even though Privacy Act provides for other remedies, and contrasting them to direct actions under the Fourth Amendment for money damages, which are Bivens claims); Jones v. Hurwitz, 324 F. Supp. 3d 97, 100 (D.D.C. 2018) (finding that a Bivens claim could not be maintained because allegations were against defendants in their official capacities but that equitable action could have been maintained as a "direct cause of action arising under the Constitution"); Farmer v. Brennan, 511 U.S. 825, 846 (1994) ("If the

court finds the Eighth Amendment's subjective and objective requirements satisfied" with regard to a federal prisoner, "it may grant appropriate injunctive relief.").

Because of the conditions at FMC, Carswell, Ms. Valencia cannot take steps to protect herself—such as social distancing, hand-washing hygiene, or self-quarantining—and the government has not provided adequate protections. As COVID-19 rapidly spreads inside Carswell, the already deplorable conditions at the prison will continue to deteriorate, and incarcerated individuals there will continue to contract COVID-19 at staggering rates.

Warden and Director of BOP's failure to adequately protect Ms. Valencia from these unconstitutional conditions, or release her from the conditions altogether, constitutes deliberate indifference to a substantial risk of serious harm to Ms. Valencia, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

Because of the unlawful conduct of Warden and Director of BOP, Ms. Valencia is threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.


### F.   RELIEF REQUESTED

**WHEREFORE,** Dalia Valencia, respectfully request that the Court:

1. Declare that FMC, Carswell's custody of Ms. Valencia violates the Eighth Amendment right against cruel and unusual punishment with respect to Ms. Valencia;

2. Order a highly expedited process—for completion within no more than 48 hours—for Warden and the Director of BOP to use procedures available under the law to review Ms. Valencia enlargement of custody to home confinement (or bail pending habeas corpus) in order to reduce the density of the prison population to a number that allows for the implementation of

3. appropriate measures to prevent the spread of COVID-19, during the pendency of this petition for a writ of habeas corpus;

4. Order Warden and Director of BOP to comply with the Constitution in threating Ms. Valencia's custody.

5. Grant declaratory or compassionate release for Ms. Valencia that she receives temporary enlargement within one day of the Court's order and release her within twenty-four hours;

Ms. Valencia is knowledgeable that it is only for the FBOP to decide her place of confinement, and that this honorable court has no authority in placing her in House Confinement Under the Cares Act, however, Ms. Valencia invokes relief as this honorable court deems appropriate under the circumstances of this case.

DATED: August 19, 2020.                    Respectfully Submitted

*Dalia Valencia*

**Pro se Litigant**

**Dalia Valencia  Reg No. 59005-380**

## CERTIFICATE OF SERVICE

I, Dalia Valencia, hereby certify under penalty of perjury, that on this August 19, 2020,  I placed a copy of the foregoing: NOTICE OF MOTION AND MOTION FOR REDUCTION OF SENTENCE (COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. 3582(C)(1)(A).

COMPLAINT– FOR DECLARATORY AND INJUNCTIVE RELIEF 28 U.S.C. § 1331 AND PETITION FOR EMERGENCY RELIEF UNDER THE EXTRAORDINARY DANGEROUS NATURE OF THE COVID-19 OUTBREAK AMONG FEDERAL PRISON POPULATION

in a Mailbox at the FMC, Carswell affixed and with sufficient postage. A copy of the same was served to the Prison Warden Mr. Machel Carr at Federal Medical Center, P.O. Box 27066, Fort Worth, TX. 76127

Respectfully Submitted

_Dalia Valencia_

32

Dalia Valencia
Reg. No. 59005-380
Federal Medical Center (Carswell)
P.O. Box 27137
Fort Worth, Tx. 76127

United States District Court
Western District of Texas
El Paso Division
525 Magoffin Ave.
El Paso, Tx. 79901

LEGAL MAIL